IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 14 CR 546 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Charles P. Kocoras |
| | ) | |
| NIKESH A. PATEL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM

Defendant NIKESH A. PATEL, by and through his attorneys, ANDREW R. DEVOOGHT and C. LINNA CHEN, respectfully submits this sent-encing memorandum for this Court's consideration in fashioning a sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553.

## I.  INTRODUCTION

Mr. Patel pled guilty to all five counts of wire fraud charged in the Indictment, and accepts full responsibility for his conduct. He is tremendously sorry for what he has done and how his conduct has impacted the lives of the victims. Mr. Patel understands that he is responsible for the impact of the conviction on his life, and respectfully asks that the Court consider him in his entirety, and not just by the conduct detailed in the Indictment and Presentence Investigation Report. Since his arrest, Mr. Patel has worked extremely hard to take responsibility for his conduct, including actively assisting the Overall Receiver in recovering approximately *$86 million* in assets for victims, earning *$2.5 million* in additional monies to assist victims, and addressing his alcohol addiction issues. Mr. Patel understands that he must

1

remain focused on these tasks, both during his incarceration and after, so that he can be the father, family member, and member of society that he knows he can be.

## II.     OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT'S GUIDELINES CALCULATION

Mr. Patel respectfully offers the following objections to U.S. Probation's Presentence Investigation Report ("PSR"):

**Paragraphs 4 and 12.**   Paragraphs 4 and 12 refer to the same pretrial supervision violation report.  Mr. Patel does not separately challenge the facts alleged in Paragraphs 4 and 12.  Mr. Patel simply objects to the inclusion of both paragraphs to the extent they  incorrectly suggest Mr. Patel violated pretrial supervision on two separate occasions.  **Paragraph 47.**   Mr. Patel respectfully objects to the PSR's assessment that the total loss amount is $174,791,812.50, resulting in a 26-level increase in the offense level.  As noted in Paragraph 26 of the PSR, Mr. Patel is to "receive credit for the amount of money paid towards restitution at the time of sentencing."  As of the date stated herein, the Overall Receiver has recovered approximately $86 million for the victims.

Mr. Patel respectfully submits that the PSR should use the amount of money the receivership estate has recovered to offset the total loss amount.  This Court adopted that approach in *United States v. Sethi*, Case No. 14 Crim. 485.  In *Sethi*, the defendant, who operated a scheme to exploit the EB-5 visa program, caused a loss of approximately $160 million. However, as the result of a civil enforcement action brought by the United States Securities and Exchange Commission, all but approximately $11.5 million was recovered and returned to the investors.  The government recommended, and the Court applied the $11.5 million loss figure to add 20 levels to the defendant's base offense level, rather than the 26 levels which would have applied had a $160 million loss been used.

2

Here, between Mr. Patel's surrender of property, the help he has provided to the Overall Receiver, and other unrelated resources, the Overall Receiver has recovered approximately $86 million for the receivership estate. The unrecovered amount is approximately less than $95 million, producing a 24-level loss enhancement, rather than a 26 level loss enhancement.

**Paragraph 48**. Although Mr. Patel does not believe the government has met its burden of offering direct evidence establishing that five or more victims had their financial security or solvency substantially endangered by the scheme as this sentencing enhancement requires, *see U.S. v. Brown*, 771 F.3d 1149 (9th Cir. 2014), as part of his commitment to fully accepting responsibility for his participation in the scheme, Mr. Patel will not object to the application of this enhancement. Mr. Patel would note, however, as discussed below, that this four-level enhancement causes there to be "double counting" in financial fraud cases such as this one with larger loss amounts. *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 171, 2008 WL 2201039, at *6 (Feb. 2008) ("*Insider Frauds*") ("***Any case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting***.") (emphasis added). And this double counting has an unbelievable impact on the Guideline range. For example, here, this enhancement adds some 94 months to the low end of the Guideline range.

**Paragraph 52.** Mr. Patel respectfully objects to the PSR's assessment that he was "clearly the organizer, leader, and manager" in the offense. Significantly, as the PSR notes, the government ***did not*** ask for this enhancement in the government's version. Nevertheless, the PSR included this two-level enhancement because (1) "[t]he AUSA stated that while Patel could

not commit the offense without Mr. Fisher, Mr. Fisher would not have committed the offense without Patel," and (2) "Patel had the personal contacts and told clients to deal only with him. The AUSA added that 'everything went through [Patel].'"

"To qualify for an adjustment under § 3B1.1, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  USSG § 3B1.1 Comm. N. 2. As this Court knows, the purpose of this type of adjustment is to distinguish between more culpable and less culpable participants.  In determining a defendant's role in an offense, a court must consider several factors, such as the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  USSG § 3B1.1 cmt. n. 4; *United States v. Knox*, 624 F.3d 865 (7th Cir. 2010); *United States v. Jennings*, 599 F.3d 1241 (11th Cir. 2010).

As an initial matter, the AUSA's unsupported supposition that Mr. Fisher would not have committed the offense without Patel is neither evidence nor a relevant factor for this analysis. More importantly, the offense conduct as stated in the PSR does not support the proposed enhancement.  At all times, Mr. Patel and Mr. Fisher **worked as partners**.  Indeed, Mr. Patel and Mr. Fisher devised the scheme together.  For example, and importantly, First Farmers was only able to be accepted as a USDA approved unconventional lender after **Mr. Fisher** falsely represented First Farmers' holdings, net worth, income, and other relevant financial data to the USDA.  Specifically, Mr. Fisher, while employed at Wells Fargo, abused his position and sent letters to the USDA that contained false statements regarding First Farmer's assets.  In reliance

15516965.1
228526-10001

upon those false statements by Mr. Fisher, the USDA recognized First Farmers as an unconventional lender for several USDA loans.

Moreover, Mr. Fisher was ***never*** under the control or authority of Mr. Patel, and he exercised full autonomy in his participation in the scheme. Indeed, as the government stated, Mr. Patel could not have committed the offense without Mr. Fisher. There can be no "leader," "organizer," or "manager" in such an admittedly symbiotic partnership. Accordingly, Mr. Patel should not be subject to the 2-level leadership enhancement.

**Paragraph 59.** Paragraph 59 of the April 5, 2017 PSR calculated a total offense level of 42, but the October 27, 2017 Supplemental PSR calculated a total offense level of 40. Because it is Mr. Patel's position that he should not have been subject to 4 levels of enhancement proposed in the PSR (2 from the loss amount and 2 from the leader enhancement), Mr. Patel respectfully contends his total offense level should be 36.

**Paragraphs 68 and Paragraph 4 of the Supplemental PSR.** Mr. Patel does not object to the determination that his criminal history category is IV. He would simply note, as discussed in detail below, that his case is one where, as Section 4A1.3(b)(1) of the Guidelines contemplates, reliable information indicates that his criminal history category substantially over-represents the seriousness of his criminal history and the likelihood that he will commit other crimes, such that a downward departure to Category I may be warranted. Mr. Patel has alcohol-driven problems, which have led to his prior convictions and violations of probation, all of which were alcohol related.

**Paragraph 106**. Based on the above, Mr. Patel objects to the PSR's calculation of the guideline range. Mr. Patel respectfully submits that the total offense level is 36, and that with a criminal history category of IV, the applicable guideline range would be 262-327 months.

### III.    Section 3553(a) Factors

It is well-established that the Sentencing Guidelines are only advisory.  *United States v. Booker*, 543 U.S. 220, 245-67 (2005).  Thus, when sentencing a defendant, this Court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)."  *Nelson v. United States*, 555 U.S. 350, 351, 129 S. Ct. 890, 891-892 (2009); *United States v. Panice*, 598 F.3d 426, 441 (7th Cir. 2010).

Mr. Patel respectfully submits that consideration of the criteria set forth in § 3553(a) demonstrates that a term of imprisonment far below the Guideline range and statutory maximum is appropriate in this case.

### A.    The Nature and Circumstances of the Offense

Mr. Patel has not, nor will he now try to minimize the nature of his conduct.  That said, in determining his sentence, it is ***critically important*** to fully understand the nature and circumstances of Mr. Patel's conduct.  Mr. Patel respectfully submits that this complete picture demonstrates that a term of imprisonment far below both the Guideline range and the statutory maximum is appropriate in this case.

Despite not completing college, Mr. Patel worked hard to forge a professional career in banking at several different banks in Florida, rising to the position of Senior Vice President at Haven Trust Bank.  Unfortunately, Mr. Patel lost his job in November 2009 when Haven Trust Bank closed.  After Haven Trust Bank closed, Mr. Patel sought to employ the knowledge and skills he developed regarding commercial real estate development, as well as the knowledge he learned studying hospitality management.  Specifically, Mr. Patel used his savings to open a club in Pinellas Park, Florida.   This venture failed, and Mr. Patel lost all of his savings.

6

Although his initial venture did not succeed, Mr. Patel continued to believe in his ability to develop commercial real estate in and around Florida. Unfortunately, and inexcusably, Mr. Patel engaged in an illegal scheme with Mr. Fisher, whom Mr. Patel knew from his banking career, to raise capital to pursue this real estate development.

While it does not, *in any way*, excuse Mr. Patel's illegal conduct, it is critical to understand that Mr. Patel, *at all times*, intended to, and in fact did, utilize the vast majority of the proceeds he received from the scheme to buy older hotels, refurbish the hotels, and sell them for a profit. He *did not intend any pecuniary loss, nor did he simply take these proceeds and spend them all on himself or use them to fuel a ponzi-like scheme to ensnare new investors*.[1] It was always Mr. Patel's intention that the profits from these hotel sales would be sufficient to buy back the false loans from Pennant. *Critically*, at the time that Mr. Patel was arrested in September 2014, he was actively negotiating the sale of five hotels purchased and renovated with proceeds from the scheme. Though the Original Receiver later sold the renovated hotels for $82,375,000, resulting in a net recovery to the estate of approximately $72 million, Mr. Patel was negotiating with a potential purchaser to sell the hotels for approximately $150 to $160 million prior to the discovery of the illegal scheme. Consistent with Mr. Patel's intent that his work to remodel the hotels would not cause any pecuniary loss, this sale would have resulted in sufficient funds, together with other assets of First Farmers, to repurchase the loans from Pennant.

B.     **History and Characteristics of Mr. Patel**

Certain aspects of Mr. Patel's history and characteristics demonstrate that a term of imprisonment far below both the Guideline range and the statutory maximum is appropriate in this case.

---

[1] Unlike with Mr. Patel, there is no evidence that Mr. Fisher similarly intended no pecuniary losses. Rather, Mr. Fisher used at least a portion of his proceeds from this scheme to fund an extravagant lifestyle.

7

1. *Active Cooperation with the Overall Receiver and Other Work to Benefit the Victims*

Mr. Patel recognizes the wrong he has done, and in an effort to make amends for his wrongdoing, Mr. Patel has actively cooperated, initially with the Original Receiver and now with the Overall Receiver by, among other things, assisting the Overall Receiver in an effort to recover assets. Mr. Patel's cooperation has included numerous meetings and telephone conferences with the Overall Receiver's attorneys in Chicago and in central Florida in which Mr. Patel answered questions concerning the operation of First Farmers, and its assets, and dealings with third parties. Mr. Patel has complied with every request from attorneys for the Overall Receiver to meet either in person or by phone to provide answers to questions and any other assistance requested. ***These efforts have assisted the Overall Receiver in obtaining approximately $86 million for the victims.***

Moreover, since his arrest and plea, Mr. Patel has worked diligently on new, unrelated deals, earning significant commissions, all for the benefit of the Overall Receiver. As of the date hereof, Mr. Patel has earned and received ***$2.5 million***, all of which is being held in trust by Mr. Patel's attorneys. This sum is held as restitution fund, and will be released to the defrauded investors upon an agreed order issued by this Court to permit such release.

Specifically, since his arrest and plea, as detailed for the Court in Mr. Patel's several motions for continuances, Mr. Patel has worked diligently on major development projects that have resulted ***in an additional $2.5 million earned and deposited in the client funds account*** of Mr. Patel's attorneys as a fund for restitution for the defrauded investors. ***Critically, these are additional, new funds generated as a result of Mr. Patel's work that have absolutely nothing to do with the scheme or any proceeds generated from the scheme.***

15516965.1
228526-10001

Lastly, Mr. Patel has been working diligently to facilitate and schedule a closing for the sale of Quality Inn – Main Gate South, in Davenport, Florida. Counsel for Mr. Patel understands that the sale of this property and land, for a total of approximately $5 million, is important both to the Overall Receiver and to the Small Business Administration, so as to avoid the government incurring a substantial loss.

Mr. Patel's efforts both to recover assets and generate new monies to assist victims have been recognized and documented by the Overall Receiver. Indeed, as the Court knows, counsel for the Overall Receiver has written multiple letters in support of Mr. Patel's motions to continue sentencing in light of the substantial assistance that Mr. Patel had provided, the unique and concrete opportunities that Mr. Patel generated, and the resulting funds these opportunities have provided for the benefit of the victims. *See* Dkt. Nos. 91-1, 94-1. Moreover, it is Mr. Patel's understanding that counsel for the Overall Receiver will be writing an additional letter regarding Mr. Patel's efforts in anticipation of the upcoming sentencing hearing.

### 2. *Mr. Patel's Role as a Father, Family Member, and Volunteer*

Mr. Patel was born in Arkansas and raised in Florida. As noted above, he has some college education, but not a degree. He is 33 years old, married, and the father of four young children under the age of seven. He and his family currently reside with his parents and grandmother, and are dependent upon his parents and other relatives while Mr. Patel works to assist the court appointed Overall Receiver in recovering money and property for the benefit of the victims. Mr. Patel is extremely close with and involved in the lives of his four young daughters.

When not actively working to assist the Overall Receiver, or to generate concrete opportunities to provide substantial payments to the victims, Mr. Patel has been donating his

15516965.1
228526-10001

time, engaging in community service in and around the central Florida area where he resides. For example, as noted and documented in one of Mr. Patel's motion to continue, the Gujarati Society of Central Florida, the largest, oldest, and most prominent Indian not-for-profit community organization in Central Florida, recently honored Mr. Patel for his fundraising efforts and volunteer work. Dkt. No. 94-3 (also attached hereto for reference).

### 3. Treatment for Alcoholism

Mr. Patel is an alcoholic. He falls into Criminal History Category IV because he has been convicted of three alcohol-related misdemeanors, and because he committed the relevant offenses here while on probation for one of these misdemeanors. Mr. Patel violated the terms of his pretrial supervision in February 2015 and in April 2017, and both incidents were alcohol-related. In February 2015, Mr. Patel consumed alcohol in violation of the terms of his pretrial supervision, and in April 2017, Mr. Patel was arrested in Panama City, Florida and charged with driving under the influence, and possession of a suspended driver's license.

Mr. Patel recognizes the harm of not treating his alcoholism, and since his April 2017 arrest, he has seen a counselor to treat his alcoholism.

### C. The Need to Avoid a Disparate Sentence as Compared to Mr. Fisher

A term of imprisonment far below both the Guideline range and the statutory maximum is necessary to avoid a disparate sentence as compared to Mr. Fisher.

Guidelines Policy Statement number 4 [Ch 1 Pt. A. 4.] discusses how the Commission handled the choice between adopting a "real offense conduct" or a "charge offense conduct" system as the basis for the Guidelines. Ultimately the Commission chose a modified "real offense conduct" system, in part because it believed that a defendant's actual, provable conduct would impose a natural limit on a prosecutor's ability to increase a defendant's sentence through

manipulation of the charges. The Commission stated that one of the most important flaws in a charge offense system is:

> the potential it affords prosecutors to influence sentences by increasing or decreasing the number of counts in an indictment. Of course, the defendant's actual conduct (that which the prosecutor can prove in court) imposes a natural limit upon the prosecutor's ability to increase a defendant's sentence. Moreover, the Commission has written its rules for the treatment of multicount convictions with an eye toward eliminating unfair treatment that might flow from count manipulation.

As the charging decisions relating to this fraud reflect, it is also possible to manipulate sentencing in the choice of substantive crimes to charge. According to both the indictment filed in this case and the PSR, Mr. Patel and Mr. Fisher worked together to accomplish this fraud, and both used the money for personal use. The major difference between Mr. Patel and Mr. Fisher is that Mr. Fisher used the money to unsuccessfully invest in businesses and to fund a luxurious lifestyle, while Mr. Patel used the money to acquire hotels for remodeling, which resulted in millions of dollars to recover, and would have resulted in no loss had Mr. Patel's effort to sell the hotels been allowed to continue. *Yet Mr. Fisher was charged by information not with a massive fraud achieved by multiple instances of wire fraud, but with engaging in a single monetary transaction in criminally derived property, the transfer of $450,000 from one bank to another. As a result, Mr. Fisher was exposed to a maximum sentence of 10 years, while Mr. Patel is exposed to a 20-year sentence on <u>each</u> of the five counts*.

Clearly, the Commission's policy of comparable sentences for comparable behavior is in jeopardy of not being effectuated in this case. A sentence for Mr. Patel anywhere near the Guideline range or statutory maximum would lead to an unfair sentencing disparity between Mr. Patel and Mr. Fisher, who is equally culpable, whose conduct was necessary to carry out the scheme, and whose efforts in concert with Mr. Patel helped produce the loss to Pennant and its

15516965.1
228526-10001

clients. For purposes of this assessment, the Court need only look to the government's account of the facts in the plea agreement it entered into with Mr. Fisher.

Although Mr. Fisher's plea agreement sets his restitution amount at the full $175 million, and per the plea agreement, the offense level is increased 26 levels for a $175 million loss, the same as Mr. Patel, the information charges Mr. Fisher only with the substantive offense money laundering in an amount of just under half a million dollars. ***Even more telling***, ***although the Guideline calculation in Mr. Fisher's plea agreement based on the government's assessment of Mr. Fisher's conduct would result in a Guideline range of 262 to 327 months – the same range that would apply to Mr. Patel here*** (*supra*, 6), the government has capped Mr. Fisher's punishment at 10 years, rendering the loss enhancement meaningless in any practical sense.

Additionally, the statement of the offense conduct in the PSR and in Mr. Fisher's plea agreement readily demonstrates that the conduct of Mr. Patel and Mr. Fisher was joint, and that they were equal partners in the fraud. While their conduct differs in some respects, it is equally serious—nothing Mr. Fisher did can be described as trivial when compared to Mr. Patel's offense conduct. Yet Mr. Fisher received significantly more lenient treatment. The inequitable treatment Mr. Patel has received, as compared to Mr. Fisher, when both men committed nearly identical conduct, demonstrates that a term of imprisonment far below both the Guideline range and the statutory maximum is necessary to avoid a disparate sentence as compared to Mr. Fisher.

***Finally, and significantly***, contrary to Mr. Patel's significant and proactive efforts to earn monies for the benefit of the Overall Receiver, ***Mr. Fisher has not assisted the Overall Receiver at all, and has in fact, impeded the Overall Receiver***. For example, in the receivership action, *In re: First Farmers Financial Litig.*, No. 14 Civ. 7581 (N.D. Ill), Mr. Fisher was subject to a restraining order that prevented him from disposing of assets. However, when the order lapsed,

**a**nd **in direct violation of the court's order enjoining him** from completing any sale of his home, or, alternatively, if the property had already been sold, "disposing, using or otherwise transferring the proceeds from the sale of [his home]" (No. 14 Civ. 7581, Dkt. No. 590), Mr. Fisher sold his home for approximately $1.2 million and used substantially all the proceeds to pay personal debts. No. 14 Civ. 7581, Dkt. No. 1074. The Overall Receiver then filed a motion in the receivership action seeking an order requiring Mr. Fisher to turn over any proceeds remaining from the October 2015 sale of real property. On December 22, 2016, Judge St. Eve granted the motion and entered an order that required the restrained funds, in the amount of $79,380 or the proceeds remaining from the sale of the home, whichever is greater, to be transferred to the Overall Receiver. No. 14 Civ. 7581, Dkt. No. 1322. Despite this order, Mr. Fisher turned over no such proceeds, and on January 27, 2017, the court ordered that certain bank accounts, totaling only **$7,823.52**, be transferred to the Overall Receiver. No. 14 Civ. 7581, Dkt. No. 1355.

Mr. Patel, who never intended any pecuniary loss, who was a partner with Mr. Fisher in carrying out this illegal scheme, and who has, since his arrest, sought out work to pay restitution, and actively cooperated with the Overall Receiver to recover funds for the benefit of the victims, a sentence far below both the Guideline range and the statutory maximum is necessary to avoid a disparate sentence as compared to Mr. Fisher, who not only is equally culpable, but has also actively impeded the Overall Receiver's efforts.

### D. The Need to Provide Restitution to Victims of the Offense

A term of imprisonment far below both the Guideline range and the statutory maximum is necessary to enable Mr. Patel to provide further restitution to victims.

15516965.1
228526-10001

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. §3553(a)(7); *see also, e.g., United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a nonincarcerated and employed defendant"); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061- 62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution).

Mr. Patel has demonstrated that he is uniquely positioned and committed to providing restitution to the victims of the scheme. He has already earned ***$2.5 million in commissions***, the sum of which is being held in his attorneys' trust account for restitution. Further, Mr. Patel continues to receive opportunities for additional projects that would allow him to generate funds. For example, Mr. Patel could work on several other, different projects after his sentencing hearing and prior to his reporting to begin his term of imprisonment if the Court were to set a somewhat extended report date. Additionally, Mr. Patel has been working as a consultant on a major renovation project in Panama City, Florida, and is working to obtain approximately $5.8 million, which (after paying taxes) he will turn over to the Overall Receiver. Here again, allowing Mr. Patel to have a somewhat extended report date will allow him to facilitate his receipt of this payment. Accordingly, Mr. Patel has demonstrated that he is in the unique position of being able, post-arrest, and even post-sentencing, to make significant restitution. When combined with what the Overall Receiver has recovered, and will continue to recover, the victims' losses can be significantly reduced even further. Mr. Patel asks that the Court consider

15516965.1
228526-10001

his continued cooperation with the Overall Receiver, and his unique position to make significant restitution in a short period of time to the victims, in determining his sentence.

E.     **The need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 18 U.S.C. § 3553(a)(2)**

A term of imprisonment far below both the Guideline range and the statutory maximum will reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  Mr. Patel readily acknowledges that the offenses he committed are serious.  However, the loss table and enhancements, as discussed further below, exaggerate the seriousness of the offense, *particularly* in light of Mr. Patel's efforts to assist, and success in assisting, the Overall Receiver in recovering property for the ultimate benefit of the victims, and in light of Mr. Patel's continuing work to earn millions of dollars in commissions for the benefit of the Overall Receiver.

Mr. Patel's actions were guided by poor judgment and greed.  However, as explained above, Mr. Patel's intentions were to use most of his proceeds from the sale of the fraudulent loans to purchase hotels for renovation and resale so as to buy back the fraudulent loans from Pennant, and *not to cause any pecuniary harm*.  In fact, at the time Mr. Patel's fraudulent conduct was discovered, he was negotiating with a potential purchaser to sell the hotels for approximately $150 to $160 million, which together with First Farmers' other assets, would have avoided any loss to Pennant and its customers.

This prosecution, its attendant consequences, and a term of imprisonment far below the Guideline range and statutory maximum are sufficient to promote respect for the law here.  Moreover, respect for law can also be promoted when a defendant is able to provide significant restitution, such as Mr. Patel is able to do here.  Mr. Patel's unique efforts to obtain recovery of

15

assets and payment of significant restitution will promote respect for the law as well as reducing the loss incurred by the victims.

**F.      The need to afford adequate deterrence to criminal conduct**

A term of imprisonment far below either the Guideline range or the statutory maximum will be more than sufficient to effectuate the goals of specific and general deterrence. In terms of specific deterrence, Mr. Patel fully understands the harm he has caused and the illegal nature of his conduct. And he will be painfully aware of this fact for the rest of his life. Moreover, Mr. Patel's only other trouble with law enforcement has been alcohol-related, and he is focused on staying healthy in addition to repairing the damage he has caused through the illegal scheme. He is committed to both of these goals and a term of imprisonment far below either the Guideline range or the statutory maximum will be more than enough punishment for Mr. Patel to understand that he cannot, under any circumstances, return to his inexcusable conduct of the past.

As for general deterrence, Mr. Patel's deserved humiliation has been very public. Indeed, anyone with a television or access to print media or the internet has witnessed and will continue to witness Mr. Patel's humiliation. This is particularly true in Mr. Patel's home city (Orlando) and state (Florida) where Mr. Patel carried out the bulk of his conduct. Simply put, no one wants to be Mr. Patel. Thus, in addition to all of the foregoing, a term of imprisonment far below the Guideline range or the statutory maximum would deter anyone considering engaging in similar conduct, who otherwise has the medical and mental wherewithal to resist such behavior.

**G.      The need to protect the public from further crimes of the defendant**

There is no need to protect the public from Mr. Patel, who, other than the alcohol-related offenses, has been living a law abiding life since his involvement in the underlying conduct here.

16

Moreover, since his last alcohol-related arrest, Mr. Patel has been diligently working towards living a healthy and sober life.

### H. Further Training, Medical Care or Correctional Treatment

Mr. Patel should continue to receive treatment for alcoholism during any period of incarceration, but does not require any other special medical, vocational, or other care, training or education.

### I. The Advisory Guideline Range

Though the advisory guideline range is one factor this Court considers in determining Mr. Patel's sentence, *see Biddle*, 2014 U.S. Dist. LEXIS 143733 at *11 (citing 18 U.S.C. § 3553(a)), the Guideline provisions applicable to Mr. Patel are uniquely flawed such that the resulting advisory guideline range does not warrant the same weight it might deserve in cases involving other Guideline provisions. This is particularly true here, where, despite serving as the primary driving force behind the offense level in Mr. Patel's case, the amount of loss does not provide an accurate measure the unique circumstances of this case.

#### 1. The Amount of Loss Overstates the Seriousness of the Offense

The amount of loss is often a kind of accident and thus a relatively weak indicator of moral seriousness, or the need for deterrence. *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). In recognition, perhaps, of the problems of irrationally harsh sentences under §2B1.1, the Guidelines themselves recognize that departures may be warranted in fraud cases where the Guideline substantially overstates the seriousness of the offense. USSG §2B1.1, comment, n.19(C).

Indeed, although the court must properly calculate the guideline sentencing range, the court may not presume the guidelines range is reasonable. *Gall*, 552 U.S. at 49, *Rita*, 551 U.S. at

351. Even though the court must still consider the sentencing range, it is, after *Booker*, nothing more than a suggestion that might be persuasive, but might not. *United States v. Glover*, 431 F.3d 744, 752-53 (11th Cir. 2005) (Tjoflat, J., concurring).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons why it may be fair to assume that the guidelines reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. First, the original Sentencing Commission used an empirical approach which began with "an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." *Rita*, 551 U.S. at 349. Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Rita*, 551 U.S. at 350. The Supreme Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline does not exemplify the Commission's exercise of its characteristic institutional role—because the Commission did not take account of empirical data and national experience—the sentencing court is free to conclude that the guideline yields a sentence greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case. *Kimbrough*, 552 U.S. at 109-10.

The fraud guidelines are not the product of careful study, nor are they based on empirical evidence. The Commission simply decided to require incarceration in every fraud case, based on no identifiable evidence. Since then the loss amount enhancement has gone steadily up, and other specific offense characteristics have been added. The first fraud guideline, § 2F1.1, included two specific offense characteristics in addition to loss, one with four subparts applicable in the alternative and one that required a floor of 12 levels. *See* USSG § 2F1.1 (1987). Today, §

2B1.1 has two alternative base offense levels, plus eighteen cumulative specific offense characteristics, many with multiple alternatives, plus four cross references, with multiple alternatives. *See* USSG § 2B1.1 (2012). In the original guidelines, if there was "more than minimal planning" and "more than one victim," only a single 2-level enhancement applied. USSG § 2F1.1 (1987), Today, "sophisticated means," "substantial hardship to five or more victims," and "jeopardizes the safety of a financial institution" cumulatively produce a 10-level enhancement. And the unwarranted "role in the offense" adjustment adds two more.

Ten of the levels used to calculate Mr. Patel's guideline range—totaling an additional 225 months at the bottom of the guidelines range[2]—come from specific offense characteristics in § 2B1.1. The additional 2-level adjustment for role in the offense brings this disparity to a staggering 250 months at the bottom of the guidelines range.

These specific offence characteristics are closely correlated with each other and with loss. *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *6 (Feb. 2008) ("*Insider Frauds*"). "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Insider Frauds* at 170. "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide." *Id.* Accordingly, as noted above, "any case involving a corporate officer and a multimillion-dollar fraud will almost always trigger

---

[2]This is arrived at by subtracting the bottom of the guideline range at offense level 30 from the bottom of the range for the level 40 calculated by the Supplemental PSR. The disparity at the top of the range cannot be calculated, since the top of range assigned by the Supplemental PSR is life imprisonment.

15516965.1
228526-10001

application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting." *Id.* at 171. *See also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1648-49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation"); Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("[T]he loss table often overstates the actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics.").

In fact, the Commission itself has recognized this problem of "factor creep," in which, as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." *Fifteen Year Report* at 137.

Moreover, the Commission has quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased. The effect of those increases on this case has been to more than double the offense level, from 19 (1987) to 42 (2017).

15516965.1
228526-10001

Lastly, inflation has also artificially enhanced sentences in fraud cases. By way of example, the Bureau of Labor Statistics inflation calculator shows that $100 million in 2014 dollars was equivalent to $47.5 million in 1987.[3]

The continuing increases in the fraud guideline have led to the absurd result that first-time, nonviolent fraud offenders are subject to guideline ranges as high as those imposed on armed drug traffickers and even higher than those applicable to the most violent offenders. The Supplemental PSR assigned an offense level of 40 to this non-violent economic offense. The base offense level for first degree murder is 43, § 2A1.1. For second degree murder, the base level is 38—two levels below that ascribed to Mr. Patel. An assault with intent to commit murder which was undertaken for hire and which results in permanent injury, produces an offense level of 41. § 2A2.1. The base offense level for manufacturing or distributing a kilo of heroin, or five kilos of cocaine is 38; to get to level 40, a defendant would also have to possess a dangerous weapon or use or threaten to use violence. § 2D1.1(a)(2); (b)(1) & (2). A parent who sells his minor child's sexual services over the internet would receive an offense level of 38. § G1.3(a)(1), (b)(1), (b)(3). To equate someone who has committed a non-violent economic offense with persons who commit such violent offense is not reasonable, and the Court should significantly depart from the loss-driven, cumulative nature of the guidelines calculations for Mr. Patel's sentence.

> 2.    *Courts Have Recognized that Guideline Ranges in Fraud Cases*
> *Driven by Lost Amounts are Generally Excessive*

Not surprisingly given the above, since *Booker*, sentences in fraud cases have been going steadily down, reflecting the courts' recognition that the loss-driven guidelines significantly

---

[3]CPI inflation calculator, bureau of labor statistics, U.S., Department of Labor, *available at* https://data.bls.gov/cgi-bin/cpicalc.pl  (last accessed April 17, 2017)

overstate the seriousness of the offense. Indeed, statistics from the U.S. Sentencing Commissions *Sourcebook of Federal Sentencing Statistics* show that the total percentage of below guidelines sentences in fraud cases has increased almost every year since *Booker* was decided: in 2005 courts departed from the guidelines in approximately 33% of fraud cases, and 46% of those departures were not sponsored by the government; by 2015, courts departed from the guidelines in 57.6% of fraud cases, and 53% of those departures were not sponsored by the government.

### J.     Policy Statements

As noted above, § 4A1.3(b)(1) of the Guidelines provides that if reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted. Mr. Patel respectfully contends that his criminal history category does substantially over-represent the seriousness of his history, and requests a downward departure to Category I.

Mr. Patel has alcohol-driven problems, which have led to three prior convictions, and two violations of probation. Nonetheless, Criminal History Category IV greatly exaggerates the seriousness of his prior criminal history. All of Mr. Patel's offenses were misdemeanors, and all were alcohol related. Placing Mr. Patel in Criminal History Category IV rather than Category I adds 74 months to the low end and 92 months to the high end at level 36. This excessive penalty is wholly attributable to offenses for which Mr. Patel could not have received a sentence of more than 12 months in the first instance.

15516965.1
228526-10001

## CONCLUSION

For the foregoing reasons, Mr. Patel respectfully submits that a sentence far below the Guideline range and statutory maximum is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Dated:      January 5, 2018      LOEB & LOEB LLP

By: /s/ Andrew R. DeVooght
     Andrew DeVooght
     321 N. Clark Street, Suite 2300
     Chicago, Illinois 60654
     Tel: 312.464.3100
     Fax: 312.464.3111
     adevooght@loeb.com

     C. Linna Chen (*pro hac vice*)
     345 Park Avenue
     New York, New York 19460
     Tel: 212.407.4000
     Fax: 212.407.4990
     lchen@loeb.com

     *Attorneys for Defendant*
     *Nikesh A. Patel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

/s/ Andrew R. DeVooght
Andrew R. DeVooght
LOEB & LOEB LLP
321 N. Clark St., Suite 2300
Chicago, IL 60654
Phone: (312) 464-3100
Fax: (312) 464-3111
adevooght@loeb.com

15516965.1
228526-10001